Ross, District Judge.
There is but a single question presented by the demurrer to the complaint in this case, and that is, does the act of congress of October 1,1890, (26 St. p. 600,) commonly known as the “McKinley Bill,” repeal the provision of the act of March 3, 1883, (22 St. p. 511,) as amended by the act of June 19, 1886, (24 St. p. 81,) granting a drawback in certain cases upon»bituminous coal imported into the United States? That portion of the act of March 3,1883, fixing a duty on coal is found in Schedule N of the act, and reads as follows:
“Coal, bituminous and shale, seventy-five cents per ton of twenty-eight bushels, eighty pounds to the bushel. A drawback of seventy-five cents per ton shall be allowed on all bituminous coal imported into the United States which is afterwards used for fuel on board of vessels propelled by steam which are engaged in the coasting trade of the United States, or in the trade with foreign countries, to be allowed and paid under such regulations as the secretary of the treasury shall prescribe. ”
By section 10 of the act of June 19, 1886, it was declared—-
“That the provisions of Schedule N’ of An act to reduce internal revenue taxation, and for other purposes,’ approved March 3, 1883, allowing a drawback.on imported bituminous coal used for fuel on vessels propelled by steam, shall be construed to apply only to vessels of the United.States.”
*576 That portion of Schedule N of the act of October 1, 1890, entitled “An act to reduce the revenue and equalize duties on imports, and for other purposes,” reads:
“Coal, bituminous and shale, seventy-five cents per ton of twenty-eight bushels, eighty pounds to the bushel. Coal slack or culm, such as will pass through a half-inch screen, thirty cents per ton of twenty-eight bushels, eighty pounds to the bushel.”
If there was nothing more in the act of October 1, 1890, upon the subject in question, there would be no difficulty in reaching the conclusion announced by the attorney general in an opinion given by him in answer to a similar question propounded to him by the secretary of the treasury, (19 Op. Attys. Gen. U. S. 687;) for, as he there says, and as was said, in substance, by Judge Lacombe in Re Straus, 46 Fed. Rep. 522, the act of October 1, 1890, was manifestly intended as a complete revision of the tariff laws, and therefore the law upon the subject in hand is to be ascertained by reference to the terms and provisions of that act. And the omission from that portion of Schedule N of the act of October 1, 1890, imposing a duty of 75 cents a ton on bituminous coal, of the drawback clause in relation to such coal contained in the act of March 3, 1883, as amended by section 10 of the act of June 19, 1886, would, in the absence of any other or further provision upon the subject, clearly manifest the intention, of 'congress to abolish such drawback. But the act of October 1, 1890, declares in section 25—
“That where imported materials on which duties have been paid are used in the manufacture of articles manufactured or produced in the United States, there shall be allowed, on the exportation of such articles, a drawback equal in amount to the duties paid on the materials used, less 1 per centum of such duties: provided that, when the articles exported are made in part from domestic materials, the imported materials, or the parts of the articles made from such materials, shall so appear in the completed articles that the quantity or measurement thereof may be ascertained: and provided, further, that the drawback on any article allowed under existing law shall be continued at the rate herein provided; that the imported materials used in the manufacture or production of articles entitled to drawback of customs duties when exported shall, in all cases where drawback of duties paid on such materials is claimed, be identified, the quantity of- such materials used and the amount of duties paid thereon shall be ascertained, tile facts of the manufacture or production of such articles in the United States, and their exportation therefrom, shall be determined, and the drawback due thereon shall be paid to the manufacturer, producer, or exporter, to the agent of either, or to the person to whom such manufacturer, producer, exporter, or agent shall in writing order such drawback paid, under such regulations as the secretary of the treasury shall prescribe. ”
It is upon the true construction of this section that the decision in the present case, in my opinion, hinges.
It is urged on the part of the government that section 25 deals exclusively with drawbacks upon exports, and that the word “article” in the second proviso “means and refers to an exported article, and to no other.” An analysis of the section does not sustain the contention. The section provides in distinct terms for a drawbrack—First, on all ar *577 tides wholly manufactured from imported materials and thereafter exported; second, for a drawback on all articles made partly from imported materials and thereafter exported. This language, as said by plaintiffs counsel, covers every possible manufacture made in this country, whether wholly, or partially only, of foreign materials, and thereafter exported. These provisions are followed by the proviso that the drawback allowed “under existing law on any article shall be continued at the rate herein provided;” that is to say, the amount returned shall be that of the duty paid, less 1 per centum. There could be no clearer recognition than is here expressed of the fact that there were at the time of the passage of the act of October 1, 1890, existing laws providing for drawbacks. Among them, as has been seen, was the act of March 3,1883, as amended by that of June 19, 1886, giving a drawback on bituminous coal imported into this country, and used on steam vessels of the United States. This drawback was, therefore, by the express language of the second proviso of section 25 of the act of October 1, 1890, continued, but at the rate provided in that section, to wit, the amount of duty paid, less 1 per centum. This, it seems to me, is the natural and ordinary meaning of plain language. There is not only no authority in the court to interject by construction the word “exported,” as the attorney for the government contends should be done, before the word “article” in the proviso in question, but it would, in effect, be so to construe that proviso as to make it apply to drawbacks on exported articles specifically provided for in the preceding clauses of the section; that is to say, to drawbacks on articles manufactured in this country wholly or partially of foreign materials and thereafter exported. The court is not at liberty to say that congress meant by the words embodied in the proviso in question to provide for the same drawbacks it had immediately before made specific provision for; nor is it at liberty to hold that the legislature, in declaring “that the drawback on any article allowed under existing law shall be continued at the rate ” specified in the section, did not mean what its language naturally and plainly imports. It is true that ordinarily the office of a proviso is to restrain or qualify some preceding matter, and will be so restricted in the absence of anything in its terms, or in the subject it deals with, indicating an intention to give it other and broader effect; but where, as in the present case, to restrict it to the matter preceding it would, as has been shown, make it mean precisely the same thing as the clause to which it is appended, the language employed should be given the natural and ordinary meaning it conveys as an independent clause. “Like everything else, interpretation has its limits, beyond which it cannot legitimately gb. Where the legislative meaning is plain, there is not only no occasion for rules to aid the interpretation, but it is contrary to the rules to employ them. The judges have simply to enforce the statute according to its obvious terms.” Bish. Writ. Law,- § 72; Thornley v. U. S., 113 U. S. 313, 5 Sup. Ct. Rep. 491.
The laws existing at the time of the passage of the act of October 1, 1890, allowing drawbacks, were not uniform. In some cases the draw *578 back was fixed at the amount of duties paid, less 10 per cent.; in others the deduction was 1 per cent.; and by the act of March 8,1888, the full amount of duty paid on bituminous coal was allowed as a drawback. Rev. St. §§ 8017, 3026; 18 St. p. 340; 23 St. p. 57. By the second proviso of section 25 of the act of October 1, 1890, the amount of drawback allowed is placed on all articles at a uniform rate, with certain exceptions specially provided for elsewhere in the act, as, for example, in paragraph 322, (26 St. p. 588,) in relation to salt. The provision of the act of March 3, 1883, in regard to that article, was as follows:
“Salt in bags, sacks, barrels, and other packages, twelve cents per one hundred pounds; in bulk, eight cents per one hundred pounds: provided, that exporters of meats, whether packed or smoked, which have been cured in the United States with imported salt, shall, upon satisfactory proof, under such regulations as the secretary of the treasury shall prescribe, that such meats have been cured with imported salt, have refunded to them from the treasury the duties paid on the salt so used in curing such exported meats in amounts not less than one hundred dollars: and provided, further, that imported salt in bond may be used in curing fish taken by vessels licensed to engage in the fisheries, and in curing fish on the shores of the navigable waters of the United States, under such regulations as the secretary of the treasury shall prescribe; and, upon proof that the salt has been used for either of the purposes stated in this proviso, the duties on the same shall be remitted.” 22 St. p. 514.
By the act of October 1, 1890, the order of the enactment is somewhat changed, but it is, in substance, the same, and is as follows:
Salt in bags, sacks, bárrels, or other packages, twelve cents per one hundred pounds; in bulk, eight cents per one hundred pounds: provided, that imported salt in bond may be used in curing fish taken by vessels licensed to engage in the fisheries, and in curing fish on the shores of the navigable waters of the United States, under such regulations as the secretary of the treasury shall prescribe; and, upon proof that the salt has been used for either of the purposes stated in this proviso, the duties on the same shall be remitted: provided, further, that exporters of meats, whether packed or smoked, which have been cured in the United States with imported salt, shall, upon satisfactory proof, under such regulations as the secretary of the treasury shall prescribe, that such meats have been cured with imported salt, have refunded to them from the treasury the duties paid on the salt so used in curing such exported meats, in amounts not less than one hundred dollars.” 26 St. p. 588.
This is cited on the part of the government as illustrative of the method adopted and pursued by congress in the act of October 1, 1890, when providing for the retention of existing drawback rights in respect to imported articles passing into home consumption, and not thereafter exported. The answer to this is that, in the case of the use of imported salt from a bonded warehouse in curing fish not exported, as permitted by the first provision of the above-cited paragraph of the act of 1890, there is a remission of duties, not the allowance of a drawback; which latter necessarily implies the former payment of duty; and in the case of the drawback permitted by the second provision of the paragraph on imported salt used in curing meats afterwards exported, the provision is that there shall be refunded from the treasury the duties paid on the salt so used in curing such exported meats, in amounts not less than *579 $100. It is manifest that these provisions could not he brought within the general language employed in the second proviso of section 25 of the act declaring that drawbacks allowed “under existing law on any article shall be continued at the rate herein provided;” that is to say, the amount returned shall be that of the duty paid, less 1 per centum; and therefore a special provision in relation to salt became a necessity.
Demurrer overruled, with leave to the defendant to answer within the usual time.